## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DERRICK BROOKS,**

> **Plaintiff,**

**v.**                                   Case No:  **8:17-cv-1897-02JSS**

**HEALTHCARE-IQ, INC.**

> **Defendant.**

_____

## ORDER

This cause comes before the Court for consideration after oral argument on defendant's motion for summary judgment.  Dkt. 43.  The Court finds that the "administrative exemption" of the Fair Labor Standards Act has been met by defendant, and there is no genuine issue of material fact that plaintiff is an exempt administrative employee, not entitled to overtime as an hourly worker. Accordingly, the Court grants the motion.

## I.    BACKGROUND

The recitation of facts herein is not contested.   Almost all of this recitation comes from plaintiff himself.    From July 2015 to May 2017 plaintiff worked for defendant as a training manager.  Dkt. 43-2 at 1.  Plaintiff's formal titles were: Applications Trainer (held briefly), Training Manager, and Training and Development Manager.  Dkt. 45-1 ¶ 2; Dkt. 46 ¶ 2.  Defendant sells and maintains

software packages for health care facilities that help the facilities manage their

costs and operations.   Dkt. 43-5 ¶ 2.   Plaintiff was a trainer of customers,

primarily, on these software packages.  Dkt. 42 at 296-97.  Defendant sold three

main software packages, which plaintiff testified were "all very complex."  *Id.* at

275.

Plaintiff stated that in this job he "[m]anaged the curriculum design and

delivery of three complex medical software programs targeting hospital

corporation supply chain operations, medical surgical optimization in performance

and strategic utilization and a dynamic fractal map presentation tools for key

management professionals."  This description of plaintiff's role comes from his

present resume, which he attested to in his deposition.  Dkt. 42 at 46-48; Dkt. 43-2

at 1.   Plaintiff stated that as part of these duties for defendant he "[t]ravelled

nationwide to culminate the onboarding of new customers and re-engaging current

customers, including advancing customer use of the full portfolio of software

options, resulting in increased revenue."  Dkt. 43-2 at 1.

As part of this job for defendant, plaintiff states that his "key successes" for

defendant included "[c]omplete redesign of training curriculum resulting in 35%

increase in training satisfaction surveys."  *Id.*  As part of this success plaintiff

"[t]rained over 380 customers in one year with an average of 4.3 overall rating on a

1.00 (poor) to 5.00 (outstanding) scale . . . [, i]ncreased company sales and revenue

through successful training initiatives that motivated key hospital administrators to purchase and utilize additional software packages based on the success and delivery of the initial training [with o]ver 90% satisfaction scores of direct report employees." *Id.*

In his deposition plaintiff noted that he managed the curriculum design, and managed the curriculum delivery.  Dkt. 42 at 48, 58.   Concerning management of the training delivery, plaintiff stated, "I took the helm as far as the introductions and some of those things" but others helped, "[s]o I cannot say for that entire time I managed all of it.  During the end and during the time from once I became the training manager I was either doing it or consulting with someone else to do it." *Id.* at 59.

As to the training itself, plaintiff stated he was in charge.  *Id.* at 62.  On some occasions such as with an important customer, key executives of the company might have been in attendance, but plaintiff was in charge in most cases.  *Id.* at 62-64.  Sometimes distributors who had a relationship with the customer would be involved in the training, but in those instances plaintiff was still providing the content.  *Id.* at 61-64.

Besides this description of his job provided by plaintiff, the record shows that plaintiff was a skilled software trainer.  The record shows that he formulated instructional modules for new customers, on his own and with extensive discretion

exercised by himself.  He quite rightly boasted that he was able to custom-tailor instruction for the various customers, something his predecessor did not do.  *Id.* at 50-53, 286.  Plaintiff would submit a proposed curriculum that he had designed for the specific customer, and the marketing department would then have a significant role in giving feedback, often making changes.  *Id.* at 50-51.  This custom-designed instruction created by plaintiff resulted in increased favorable ratings that plaintiff received over the previous instructor.  *Id.* at 55-56, 279.  As plaintiff testified, "I completely redesigned the approach that was taken in the curriculum." *Id.* at 55.  This redesign resulted in a 35% increase in customer satisfaction surveys.  *Id.* at 55-56.   Plaintiff noted that some of this increase in customer satisfaction may also have been caused by simply more effective training, for which his presentation skills played a role.  *Id.* at 57.

The teaching modules often had graphs and illustrations in them.  Plaintiff would either design those items himself or give instructions to his colleague/assistant Michele Massimino of "a conceptual presentation of what I wanted it to look like or what I was thinking, or I would even go to marketing and give them the ideas of what I wanted it to look like or what I was hoping we could have to better illustrate the training."  *Id.* at 53.

Much of plaintiff's work was done at various customers' offices where the training took place.  *Id.* at 305.  Some training was done remotely via webinar; at times plaintiff participated in the webinars from his home.  *Id.* at 133, 151, 305.

Plaintiff started work in July 2015.  Dkt. 43-2 at 1.  At that time there was an incumbent training manager.  Notwithstanding this, plaintiff did the training curriculum update packages as the incumbent manager "hated doing it."  Dkt. 42 at 277.  Plaintiff was promoted in December 2015 when the previous training manager left.  *Id.* at 45.  At that point plaintiff was the only person doing training.  *Id.*  Plaintiff testified, "when [the previous training manager] left I handled everything. . . . So I would have had to schedule the trainings, coordinate everything, and then when [Michele] came on I approved her expense reports and had someone to assist with paperwork."  *Id.* at 45-46.

When the previous training manager departed plaintiff took his position, and plaintiff "did more of the coordination for plannings of the trainings . . . to pick up the gap to try to organize and plan and be a point of contact for trainings."  *Id.* at 276.  Upon taking over the manager slot, plaintiff did it "completely differently" than the predecessor, and the scores improved with plaintiff's trainings because, as plaintiff explained, he had superior "communication skills, organization[,] delivery."  *Id.* at 279.  Plaintiff testified he was a "more effective trainer" than the previous training manager.  *Id.*  With a new training manager came new training

5

materials: plaintiff noted "the materials change based on who's doing the training." *Id.* at 285.

Plaintiff also customized his training materials for each customer, unlike his predecessor. *Id.* at 286. This customization was done by plaintiff researching items to fit a particular customer. No one back at headquarters approved these changes. Plaintiff testified he had the discretion to make these salutary changes. *Id.* at 286. Developing these educational tools varied by each customer's needs and also varied depending upon which software package was being taught. The newest package, known as Colours, was the most complex and required the most effort to formulate the customized training. *Id.* at 289. Conducting this work and searching for pedagogic examples was left up to plaintiff – no one at headquarters told him what to do. *Id.* at 290. As to the software product called Informatics, plaintiff testified "I had a great deal of discretion." *Id.* at 304. He testified he did not have that same level of discretion with the newer and more complex Colours product; and a coworker had more say for the third software product. *Id.* During the training sessions, the customers would ask plaintiff "[a] lot" of questions and plaintiff would answer them or, if unable to, make a list to find out answers to respond later. *Id.* at 294-95.

Michele Massimino at times assisted plaintiff in a support role including helping with paperwork and training design. *Id.* at 46, 49, 53. Plaintiff reviewed

and approved her expense reports.  *Id.* at 46.  Plaintiff testified that she was a

truthful person.  *Id.* at 38.  As to plaintiff's duties and authority, Massimino

testified that mostly plaintiff did the training research and design.  Dkt. 43-3 at 2.

Plaintiff would check her work.  Plaintiff did all or most of the work on the

tutorials for the software package known as Informatics without any limitation on

what he could do, nor much or any need for approval.  He consulted with

colleagues on the other packages.  *Id.* at 2-6, 8.  To Massimino's knowledge there

was no limit on plaintiff's discretion in designing the training approach for

Informatics.  *Id.* at 11.  As she understood it, the training approach that resulted in

the increased number of users and high survey scores was plaintiff's approach.  *Id.*

at 12.

　　In addition to his resume, plaintiff has also provided to recent prospective

employers a letter of recommendation by Rebecca Varner.  Dkt. 42 at 66-67.

Plaintiff intended that prospective employers would rely on Varner's letter.  *Id.* at

68.  Varner was plaintiff's colleague when he worked for defendant.  Dkt. 48-1 at

15.  In this letter Varner stated that plaintiff redesigned the training approach for all

three of defendant's distinct software products.  *Id.*  This effort by plaintiff resulted

in more engaged customers and increased use of defendant's products by them,

said Varner.  *Id.*  Plaintiff verified that Varner's perception was correct: he did

indeed redesign the training approach for all defendant's three distinct products.

*Id.*; Dkt. 42 at 68.  Varner also stated that plaintiff was a "key asset" to any organization, and plaintiff contributed to greater customer satisfaction yielding continued and increased revenues.  Dkt. 48-1 at 15.  At oral argument on February 1, 2019, plaintiff's counsel stated that plaintiff "ghost-wrote" Varner's letter of recommendation.

Defendant treated plaintiff as a professional or administrative employee, not an hourly employee.  Plaintiff did not use or punch a time card.   Dkt. 42 at 96.  The record contains multiple instances of sick time off and personal time off, which plaintiff took and was never "docked" or penalized for.  *Id.* at 215-16, 236-37, 249, 263; Dkt. 43-4.  At one point plaintiff testified he kept working from home due to illness caused by a chemical exposure.  Dkt. 42 at 163-64.  Plaintiff's pay was also not reduced for time spent at lunch, which could be from half an hour to one hour daily and at times included alcohol.  *Id.* at 39, 119; *see also id.* at 39-40 (alcohol "common" or "commonplace" on training trips in evening.)

Likewise, some days included lengthy travel that plaintiff did not receive extra pay for.  *Id.* at 175.  And at times he was required to entertain customers in the evening; no additional salary was paid for this.  *Id.* at 10, 177.  On occasion paperwork was required to be completed "late at night" as well, "to get things done."  *Id.* at 185, 197, 220.

Plaintiff wrote up his job description for defendant into a formal document as a project for work. *Id.* at 264. The job title he recommended was listed as "Training and Development Manager," a job title plaintiff possessed. Dkt. 45-1 ¶ 2; Dkt. 42 at 264-65. Plaintiff described his job, and admitted he was working at it in the following manner:

> Leads training initiatives for all tools in a manner to foster both customer satisfaction and effective usage of the tools. . . . [F]ostering relationships and coordinating efforts with implementation, customers care, marketing, sales, IT and software development. . . . [T]akes a strategic approach to business success. [P]lans and manages both new and ongoing customer trainings. . . . [M]anages training staff. . . .

Dkt. 42 at 265-67. Plaintiff testified he was "planning and managing" but others were doing this also. *Id.* at 267. As to "managing training staff," plaintiff testified he was doing that "[i]n some ways, but not always and not for much of the time." *Id.* at 267-68. Plaintiff stated that as part of the job he attempted to ensure effective planning and a more effective curriculum, and this was something he had designed but he was unable to see its implementation because it was not approved by superiors. *Id.* at 270.

Plaintiff viewed this job as calling for a four-year college degree preferred, plus five years training and training management required. *Id.* at 272. Plaintiff himself met this education/experience criteria. Dkt. 43-2.

During plaintiff's tenure with defendant, in November 2016, the Department of Labor conducted an audit of defendant to determine, among other things, whether defendant had misclassified any employee as exempt. Defendant delivered to the Department a list of employees classified as exempt and their job descriptions. The job description defendant provided to the Department for plaintiff's job was the same or nearly identical to the description plaintiff wrote up earlier as a project. *See, e.g.,* Dkt. 43-1 at 1-6.

Though he did raise the issue with defendant, plaintiff did not demand that he be paid overtime or be put on a time clock during his tenure with defendant. He brought this suit seeking actual and liquidated damages for uncompensated overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), shortly after his employment with defendant ended. Dkt. 1. In its Answer, defendant raises a counterclaim for Unjust Enrichment and, in the alternative, Breach of Contract. Dkt. 22 at 10. For both claims, defendant seeks to set off any award to plaintiff by the amount of "salary he was not entitled to for hours he did not work that were not subject to paid time off." *Id.* at 10-11.

After discovery was completed, defendant moved for summary judgment on the basis that plaintiff fell within the administrative exemption of the FLSA and was a non-hourly worker. 29 C.F.R. §§ 200-202. Dkt. 43. Plaintiff filed a

response opposing Defendant's request for summary judgment. Dkt. 45. The lawyers ably presented their cases at oral argument on February 1, 2019.

At points plaintiff's declaration attached to his response (Dkt. 45-1) materially contradicts his deposition testimony taken earlier in the case. Dkt. 42. When considering a motion for summary judgment, "[a] district court may disregard an affidavit . . . when a party to the suit files an affidavit that contradicts, without explanation, prior deposition testimony on a material fact." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012). The Court has carefully reviewed plaintiff's deposition and declaration and has discounted those portions of the declaration that conflict with the deposition.

## II.   <u>STANDARD OF REVIEW</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id*.

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the

11

burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## III.   <u>ANALYSIS</u>

The FLSA provides that employees are entitled to receive overtime pay at one and one-half times their regular rate for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The FLSA also provides that an employee

who is employed in a bona fide administrative capacity is exempt from the FLSA's

overtime-pay requirement.  *Id*. § 213(a)(1).[1]

An exemption is "applied only to those clearly and unmistakably within the

terms and spirit of the exemption."  *Morgan v. Family Dollar Stores, Inc.*, 551

F.3d 1233, 1269 (11th Cir. 2008) (quotation omitted).  Exemptions are narrowly

construed against the employer, who bears the burden of proving that an employee

is exempt from the FLSA's overtime provision.  *Abel v. S. Shuttle Servs., Inc.*, 631

F.3d 1210, 1212 (11th Cir. 2011).  Thus, for an employer to prevail on the basis of

an exemption, it must prove the applicability of the exemption by "clear and

affirmative evidence."  *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th

Cir. 2001) (quotation omitted).

### A.     The Administrative Exemption

The administrative exemption applies if: 1) the employee is compensated on

a salary or fee basis not less than $455 per week; 2) the employee's "primary duty

is the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's

customers"; and 3) the employee's "primary duty includes the exercise of

---

[1] The FLSA authorizes the Department of Labor to issue regulations defining the executive and administrative exemptions.  *See* 29 U.S.C. § 213(a)(1).  The Court must give the regulations promulgated by the Department of Labor "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

discretion and independent judgment with respect to matters of significance." 29

C.F.R. § 541.200(a).

There is no dispute that plaintiff met the two prongs throughout his

employment with defendant.  Dkt. 45 at 3.  The Court will first address the third

prong, which is the dispositive issue here.   Defendant must clearly establish as

uncontested fact that plaintiff's primary duty involved "the exercise of discretion

and independent judgment with respect to matters of significance."  29 C.F.R.

§ 541.200(a)(3).

A "primary duty" is defined as "the principal, main, major or most important

duty that the employee performs."  *Id.* § 541.700(a).  A "[d]etermination of an

employee's primary duty must be based on all the facts in a particular case, with

the major emphasis on the character of the employee's job as a whole."  *Id.*  The

regulations provide the following non-exclusive list of factors to consider in

determining an employee's primary duty: 1) the importance of the employee's

primary duty compared with other duties; 2) the amount of time the employee

spends on the primary duty; 3) the employee's freedom from direct supervision;

and 4) the relationship between the employee's salary and the wages paid to other

employees for the other duties performed by the employee.  *Id.*  The amount of

time an employee spends performing exempt work serves as a guide but is not the

sole consideration when evaluating an employee's exempt status.  *Id*. § 541.700(b).

14

It is uncontested that plaintiff's primary duty was designing training for the three software products and conducting the training.

The second component, "the exercise of discretion and independent judgment," generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id*. § 541.202(a). The regulations provide the following non-exclusive list of factors to consider in determining whether an employee exercises discretion and independent judgment with respect to matters of significance:

> [W]hether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id*. at § 541.202(b).  "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision."  *Id*. at § 541.202(c).  The term discretion and independent judgment, however, does not require that the decisions at issue have a finality that goes with unlimited authority and a complete absence of review.  *Id*. A decision made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. *Id*.  The fact that an employee's decision may be subject to review and that upon occasion the decision is revised or reversed does not necessarily mean that the employee is not exercising discretion and independent judgment.  *Id*.  The regulations also provide that the exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," and "does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work."  *Id*. at § 541.202(e).

The third component, "matters of significance," generally includes "responsibilities dealing with matters of broad scope and significant detail that have a profound effect on an employer's business," such as committing an employer in matters that have significant financial impact, negotiating and binding the company on significant matters, or planning long-term or short-term business

objectives.  *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1313-14

(S.D. Fla. 2008) (citing 29 C.F.R. § 541.202).

### B.    Application

Plaintiff meets many of the factors for determining "discretion and

independent judgment" set forth in the Department of Labor's regulation, 29

C.F.R. § 541.202(b).  It is uncontested that this plaintiff had the authority to both

formulate and to implement management operating practices, related to the design

of the curriculum and its presentation.  As to presentation, he had very wide

authority.  And as to design, both plaintiff and his colleague Massimino assert

without contradiction that plaintiff did it all.  Other regulation factors are whether

the employee carried out major assignments in conducting the business, and

whether that work affects the business operations to a substantial degree.  Those

are plainly met.  The training function was vital to the software sales, and

plaintiff's effective training skills actually increased revenue by fostering more

sales.  Other factors in the regulation that touch upon plaintiff's administrative

discretion are his ability to deviate from established policies, and whether he

provided consultation or expert advice to management (plainly so, as he not only

created individual training modules customized for clients, but he "completely

redesigned" the entire training curriculum).

Beyond the regulatory guidance, the Court considers the parties' behavior before this lawsuit and any related motivations arose. Although one should discount labels placed upon jobs by an employer, plaintiff called himself "a manager." Plaintiff testified he managed the curriculum design and managed curriculum delivery both directly and in consultation with others. To "manage" means "to control and direct, to administer, to take charge of. To conduct; to carry on the concerns of a business or establishment. Generally applied to affairs that are somewhat complicated and that involve skill and judgment." Black's Law Dictionary 865 (5th ed. 1981). Besides "managing," plaintiff used other terms to describe what he did: "plans," and "coordination for plannings," "leads training initiatives," "takes a strategic approach to business success," and "development" of materials. Dkt. 42 at 265-69, 276. Plaintiff's own words depict the discretion, skill, and independent judgment that he used on the job.

Besides his description of his job, Plaintiff's work behavior does not support his present position that he should have been considered an hourly worker, rather than an exempt, administrative one. He behaved as a professional with lax supervision, often setting his own hours and informing supervisors later.

The record shows that in plaintiff's 22 months in defendant's employ, he called in sick during the work week and took or sought time off for medical reasons such as illness or doctor visits approximately 20 or more times. *See* Dkt.

18

43-8; Dkts. 48-2 through 48-4.  He was apparently never "docked" or penalized for this large number of times he took off.

On top of this, the record shows plaintiff also took weekdays off, arrived late, or asserted he would be "working from home" even more frequently.  He expressly stated to his boss in emails he was "working from home" numerous times.  *See* Dkt. 43-8; Dkts. 48-2 through 48-4.   An employee who informs his supervisor he is "working from home" at times of his own choosing suggests one vested with discretion, without daily or close supervision.  Certainly keeping hourly track of such an employee on a time-clock basis would be problematic for the employer.  Plaintiff took his own varying lunch periods and one or two drinks at lunch is no sin, although it tends to show independence and lack of close supervision (as does the vodka screwdriver at 10:17 am on plaintiff's expense report from the Atlanta airport.  Dkt. 48-4 at 8).

Judge Posner has noted that this situation where the employee works extensively "on the road" or away from the office supports a finding of administrative exemption.  In seeking to limn the somewhat obtuse regulations, Judge Posner noted that:

> [O]ne sees what this regulation is getting at: a legal
> requirement to pay a worker a fixed percentage increase
> in his wage if he works more than 40 hours a week
> doesn't fit a worker who spends much of his work time
> off the employer's premises, where he can't be

> supervised and so if entitled to overtime would be
> tempted to inflate his hours. See 29 C.F.R. § 541.202(c).

*Verkuilen v. Mediabank, LLC.,* 646 F.3d 979, 981 (7th Cir. 2011) (additional

citations omitted) (finding administrative exemption for manager of customer's

account who "has to learn about the customers' business" so software "can be

adapted to the customer's needs . . . [and] has to spend much of her time on

customers' premises training staff in the use of the software, answering questions

when she can and when she can't taking them back to [defendant's] software

developers").

  The most significant part of plaintiff's discretion in formulating his work

product was the freedom he had to tailor various instruction modules to the

respective clients, depending upon the client needs and situation, not unlike the

plaintiff in *Verkuilen, supra*.   How plaintiff taught and fielded customers'

questions was almost entirely up to him.   Combining this fact with the liberty

plaintiff asserted regarding his work schedule leads one to case law guidance: "key

factors illustrating that an employee does possess the requisite independence to

satisfy the administrative exemption include 'an employee's discretion to set h[is]

own schedule and to tailor communications to a client's individual needs.'" *Klein*

*v. Torrey Point Grp., LLC,* 979 F. Supp. 2d 417, 429 (S.D.N.Y. 2013) (citing *Reich*

*v. John Alden Life Ins. Co.,* 126 F.3d 1, 14 (1st Cir. 1997)).   Much like the plaintiff

in *Klein v. Torrey Point,* this plaintiff worked from home and often determined his

own schedule, including when and how to eat his daily lunch.  More importantly, he "acknowledged that he was responsible for analyzing the particular needs of individual customers" in a "very complex" task to fulfill the customers' needs.  *Id.*  The fact that plaintiff's independence was subject to checks and balances does not, as the regulations plainly indicate, automatically render his employment insufficiently independent for § 541.202 purposes.  *Id.*; *see also* 29 C.F.R. § 541.202(c).

Other courts have found a plaintiff's creation of training materials used to train others to be significant in illustrating the creator's workplace independence. *E.g.*, *Bernard v. Grp. Publ'g, Inc.,*  970 F. Supp. 2d 1206, 1225 (D. Colo. 2013). Just like plaintiff here, the seminar trainers in *Muller v. American Management Ass'n Int'l,* 368 F. Supp. 2d 1166, 1176-77 (D. Kan. 2004),  who were found to exercise discretion in their work, "ma[d]e the seminars theirs…[,] inject[ed] their own personality into the material, [used] examples or stories from their own experience, [incorporated] current events or local developments into the presentation, and [developed] a unique style of presentation." *Id.* at 1176.  As these cases show, plaintiffs who exercise their own judgment to tailor or mold solutions or approaches for clients and customers tend to exercise sufficient discretion to qualify for an overtime exemption.  *Accord Hines v. State Room, Inc.*, 665 F.3d 235, 245-47 (1st Cir. 2011) (holding that individuals selling banquet

events, who worked with discretion in helping customers select various options, exercised independent judgment and discretion regarding matters of significance to the employee and were properly classified as exempt); *Swartz v. Windstream Commc'ns Inc.,* 429 F. App'x 102, 105 (3d Cir. 2011) (employee who designed telecommunications systems for individual customers exercised discretion and independent judgment supporting administrative exemption).

Plaintiff's own words establish that he exercised quite a bit of discretion and independence in the carrying out his primary duty.  And his primary duty was indeed a matter of significance to defendant.  The administrative exemption to the FLSA is met.

Accordingly, it is ordered that defendant's Motion for Summary Judgment (Dkt. 43) is granted.  Because defendant's counterclaims seek merely to set off any award granted to plaintiff, and the Court has determined that no such award is warranted, the counterclaims are due to be dismissed.  The Clerk is ordered to enter judgment for defendant on plaintiff's one count in his Complaint and close the case.

**DONE** and **ORDERED** in Tampa, Florida on February 8, 2019.

/s/ *William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record